No. 25-1703

Public Interest Legal Foundation, Inc.,

Plaintiff-Appellant,

vs.

Steve Simon, in his official capacity as the Secretary of State for the State of Minnesota,

Defendant-Appellee,

United States of America,

Intervenor Defendant-Appellee.

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA**

**APPELLEE'S BRIEF**

KEITH ELLISON
Attorney General
State of Minnesota

NATHAN HARTSHORN
ERIN FARMER
LINNEA VANPILSUM-BLOOM
445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101-2131
(651) 757-1252

**SUMMARY OF CASE AND REQUEST FOR ORAL ARGUMENT**

Appellant Public Interest Legal Foundation, Inc. (PILF) demanded that Appellee Minnesota Secretary of State Steve Simon turn over state government data on all voters, asserting that the Secretary must produce it under the National Voter Registration Act (NVRA). The Secretary declined to provide the data because Congress expressly exempted states like Minnesota from the NVRA—specifically, the states that offered election-day registration at the time of its enactment. PILF then sued, claiming that the exemption is unconstitutional. The district court granted the Secretary's motion to dismiss, rejecting PILF's arguments and holding that Congress had authority to include exemptions as a matter of policy in the NVRA.

The Secretary agrees with PILF that oral argument would help the Court, but he believes that fifteen minutes of argument would be sufficient.

# TABLE OF CONTENTS

**Page**

SUMMARY OF CASE AND REQUEST FOR ORAL ARGUMENT ..................... i

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF ISSUES ................................................................. 1

STATEMENT OF THE CASE ............................................................. 2

SUMMARY OF ARGUMENT ............................................................ 5

ARGUMENT ...................................................................................... 6

I.      PILF LACKS STANDING BECAUSE IT HAS NOT SUFFERED A CONCRETE HARM. ............................................................................................ 6

II.     THE ELEVENTH AMENDMENT BARS PILF'S CLAIMS. ..................... 12

III.    CONGRESS CONSTITUTIONALLY EXEMPTED MINNESOTA FROM THE NVRA. ............................................................................................. 16

        A.      PILF Lacks Standing to Assert Equal Sovereignty or Congruence-and-Proportionality Claims on Behalf of the States. ...... 18

        B.      The NVRA's Exemption for Polling-Place Election Day Registration States Falls Squarely Within Congress's Elections Clause Powers. ..................................................................... 20

                1.      The equal sovereignty principle from *Shelby County* does not apply to the NVRA. ........................................... 21

                2.      Even if *Shelby County* applied, the NVRA's exemption for polling-place Election Day registration states satisfies its test. ............................................................................. 25

                3.      *City of Boerne* does not apply to Elections Clause legislation. .................................................................... 29

                4.      The challenged exemption satisfies the *City of Boerne* standard, even if it applied. ........................................ 29

CONCLUSION .................................................................................. 32

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*281 Care Comm. v. Arneson*,
  638 F.3d 621 (8th Cir. 2011) .................................................................. 14

*Allen v. Milligan*,
  599 U.S. 1 (2023) ................................................................................... 30

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
  570 U.S. 1 (2013) .............................................................................. Passim

*Ass'n for Gov't Accountability v. Simon*,
  128 F.4th 976 (8th Cir. 2025) ........................................................... 1, 15

*Bluehaven Funding, LLC v. First Am. Title Ins.*,
  594 F.3d 1055 (8th Cir. 2010) .................................................................. 7

*Bond v. United States*,
  564 U.S. 211 (2011) .................................................................................. 19

*City of Boerne v. Flores*,
  521 U.S. 507 (1997) ....................................................... 17, 29, 30, 31

*DeGidio v. Perpich*,
  612 F. Supp. 1383 (D. Minn. 1985) .................................................... 13

*F.B. v. Our Lady of Lourdes Par. & Sch.*,
  125 F.4th 898 (8th Cir. 2025) .................................................................. 6

*Fed. Election Comm'n v. Akins*,
  524 U.S. 11 (1998) ............................................................................... 7, 9

*Food & Drug Admin. v. All. for Hippocratic Med.*,
  602 U.S. 367 (2024) .......................................................................... 1, 10

*Foster v. Love*,
  522 U.S. 67 (1997) .................................................................................. 23

*Green v. Mansour*,
474 U.S. 64 (1985) ................................................. 1, 13, 16

*Hodak v. City of St. Peters*,
535 F.3d 899 (8th Cir. 2008) ................................................. 18

*Huizenga v. Indep. Sch. Dist. No. 11*,
44 F.4th 806 (8th Cir. 2022) ................................................. 6

*Kowalski v. Tesmer*,
543 U.S. 125 (2004) ................................................. 18

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ................................................. 6, 7

*Mayhew v. Burwell*,
772 F.3d 80 (1st Cir. 2014) ................................................. 24

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
567 U.S. 519 (2012) ................................................. 29

*NCAA v. Governor of N.J.*,
730 F.3d 208 (3rd Cir. 2013) ................................................. 24

*Pennhurst State Sch. & Hosp. v. Halderman*,
465 U.S. 89 (1984) ................................................. 16

*Project Vote v. Kemp*,
208 F. Supp. 3d 1320 (N.D. Ga. 2016) ................................................. 27

*Pub. Citizen v. U.S. Dep't of Justice*,
491 U.S. 440 (1989) ................................................. 7, 8, 9

*Pub. Int. Legal Found. v. Bellows*,
92 F.4th 36 (1st Cir. 2024) ................................................. 27

*Pub. Int. Legal Found. v. Dahlstrom*,
673 F. Supp. 3d 1004 (D. Alaska 2023) ................................................. 18-19

*Pub. Int. Legal Found. v. Matthews*,
  589 F. Supp. 3d 932 (C.D. Ill. 2022) ........................................... 19, 27

*Pub. Int. Legal Found. v. Sec'y Commonwealth of Penn.*,
  136 F.4th 456 (3rd Cir. 2025) ............................... 1, 11, 12, 18

*Pub. Int. Legal Found. v. Way*,
  2022 WL 16834701 (D.N.J. Nov. 9, 2022) ....................................... 19

*Quern v. Jordan*,
  440 U.S. 332 (1979) ..................................................................... 16

*Rose v. Nebraska*,
  748 F.2d 1258 (8th Cir. 1984) ................................................... 13

*Seminole Tribe of Fla. v. Florida*,
  517 U.S. 44 (1996) ......................................................... 1, 13, 15

*Sessions v. Morales-Santana*,
  582 U.S. 47 (2017) ..................................................................... 19

*Shelby County v. Holder*,
  570 U.S. 529 (2013) ..............................................................Passim

*Smiley v. Holm*,
  285 U.S. 355 (1932) ......................................................... 1, 23, 25

*South Carolina v. Katzenbach*,
  383 U.S. 301 (1966) ................................................................... 27

*Spokeo v. Robins*,
  578 U.S. 330 (2016) ..................................................................... 7

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) ................................................................. 1, 8

*United States v. Ellingburg*,
  113 F.4th 839 (8th Cir. 2024) ................................................... 17

*United States v. Morrison*,
  529 U.S. 598 (2000) ................................................................... 21

*United States v. Ohio*,
  98 F.4th 292 (6th Cir. 2024) ............................................. 24

*United States v. Stephens*,
  594 F.3d 1033 (8th Cir. 2010) ........................................... 21

*Will v. Mich. Dep't of State Police*,
  491 U.S. 58 (1989) .......................................................... 13

FEDERAL STATUTES

52 U.S.C. § 20501 .............................................. 2, 26, 27, 30

52 U.S.C. § 20503 ................................................... Passim

52 U.S.C. § 20507 ..................................................... 2, 4

52 U.S.C. §§ 20510-11 .................................................. 15

U.S. Const. amend. XI ..................................................... 1

U.S. Const. art. I............................................................ 24

STATE STATUTES

Minn. Stat. § 201.01–.276 ................................................ 3

Minn. Stat. § 201.022 ...................................................... 3

Minn. Stat. § 201.061 ...................................................... 3

Minn. Stat. § 201.091 ..................................................... 3, 4

# STATEMENT OF ISSUES

I.  Whether the district court properly determined PILF suffered an injury in fact sufficient to establish Article III standing based on its alleged informational injury.

   *The district court determined that PILF had alleged an informational injury based on the Secretary's denial of the information PILF requested under the NVRA.*

Most apposite authorities:

   *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367 (2024)

   *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021)

   *Pub. Int. Legal Found. v. Sec'y Commonwealth of Penn.*, 136 F.4th 456 (3rd Cir. 2025)

II.  Whether the Secretary is immune from PILF's suit under the Eleventh Amendment.

   *Although the Secretary raised this issue, the district court did not reach it.*

Most apposite authorities:

   U.S. Const. amend. XI

   *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44 (1996)

   *Green v. Mansour*, 474 U.S. 64 (1985)

   *Ass'n for Gov't Accountability v. Simon*, 128 F.4th 976 (8th Cir. 2025)

III.  Whether Congress constitutionally exempted states with polling-place Election Day registration from the National Voter Registration Act.

   *The district court held that the NVRA's exemption was constitutional. The district court concluded that the NVRA was not subject to the principles of equal sovereignty or congruence and proportionality, and that if those principles applied, the NVRA would violate neither.*

Most apposite authorities:

   52 U.S.C. § 20503(b)(2)

   *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013)

   *Smiley v. Holm*, 285 U.S. 355 (1932)

## STATEMENT OF THE CASE

Congress enacted the National Voter Registration Act (NVRA or the Act) in 1993 to increase voter registration and participation in federal elections and to protect the electoral process. 52 U.S.C. § 20501(b). Congress specifically defined the purpose of the Act as increasing the number of people who register and vote in elections for federal office, protecting electoral integrity, and ensuring maintenance of accurate and current voter-registration rolls. *Id.* The NVRA established federal voter registration requirements "atop state voter-registration systems," supplementing lesser-reaching state election law and supplanting contradictory systems. *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 5 (2013) (*ITCA*). To increase voter registration and participation, states must allow voters to register to vote in federal elections by mail, in person, and when applying for a driver's license. 52 U.S.C. § 20503(a).

The NVRA also requires states to follow specific procedures for confirming voter registration; managing the removal, relocation, and qualifications of registered voters from lists; and publicly disclosing voter-registration activities. *Id*. § 20507. Each covered state must publicly disclose "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." *Id.*

Recognizing that some states had already adopted measures that significantly expanded access to voter registration—most notably, same-day registration at the polls—Congress gave all states a chance to be exempt from the NVRA. *Id.* § 20503. The Act exempts from its requirements all states that, on and after August 1, 1994, permitted voters to register to vote in polling places on Election Day. *Id.* § 20503(b). Currently, Minnesota and four other states are exempt because they have allowed election-day polling-place registration continuously since 1974. *See* Minn. Stat. § 201.061 subd. 3 (2022); *see also id.* § 201.061, subd. 3 (1974).[1]

In parallel to the procedural requirements of the NVRA, the Minnesota Legislature has written extensive voter-registration and voter-list protections into state law. *See id*. §§ 201.01–.276 (2024). First, the Secretary must "maintain a statewide voter registration system to facilitate voter registration and to provide a central database containing voter registration information from around the state." *Id*. § 201.022. Minnesota law also provides for the disclosure of a collection of voter data known as the "public information list." *Id.* § 201.091, subd. 4. Any registered Minnesota voter who "state[s] in writing that any information obtained from the list will not be used for purposes unrelated to elections, political activities, or law enforcement" may obtain a copy of the public information list. *Id.*, subds. 4–5. When

---

[1] The four other states are Idaho, New Hampshire, Wisconsin, and Wyoming. The NVRA also exempts states that, as of August 1, 1994, did not require voter registration. 52 U.S.C. § 20503(b)(1). That exemption only applies to North Dakota.

a registered voter requests a copy of the public information list from the Secretary or a local election official, the official must provide a copy of the list within ten days of receiving the request and payment for the cost of reproduction.[2] *Id.*, subd. 5.

PILF is a Virginia-based organization focused on election issues. (App. 8-9, R. Doc. 1 at 2, ¶ 5.) In 2024, PILF wrote to the Secretary requesting Minnesota's registered voter list, citing the NVRA's public-disclosure provision as the basis for its request. (App. 30, R. Doc. 1 at 24, ¶ 108.) Because the NVRA does not apply to Minnesota, the Secretary treated the request as one made under Minnesota's public-records law. (App. 31, R. Doc. 1 at 25, ¶ 115.) But under that law, Minn. Stat. § 201.091, only registered Minnesota voters may obtain the public information list. (*Id.* ¶ 117.) As a result, the Secretary declined to provide the requested data. (*Id.*)

PILF then filed this lawsuit, alleging that the Secretary violated the public disclosure provision of the NVRA, 52 U.S.C. § 20507(i)(1). The district court dismissed the complaint, holding that Minnesota is expressly exempt from the NVRA's mandates and that PILF therefore failed to state a claim. (App. 61, 71, R. Doc. 43 at 3, 13, Add. 3, 13.) In so doing, the court also rejected PILF's

---

[2] Other than requiring the attestation that the information obtained will not be used for purposes unrelated to elections, political activities, or law enforcement, nothing in section 201.091 restricts a Minnesota registered voter from obtaining the public information list on behalf of an organization or entity and distributing the information on the list to volunteers or employees of that organization or entity.

constitutional challenges, concluding that Congress acted within its authority and did not violate equal sovereignty or other constitutional principles by exempting states like Minnesota from the NVRA's requirements. (*Id.* at 8-13.)

## SUMMARY OF ARGUMENT

The Court should affirm the dismissal of PILF's claims. The parties agree that, on its face, the NVRA exempts Minnesota and other states with polling-place Election Day registration from its requirements—including the obligation to disclose the information PILF seeks. PILF nonetheless asks the federal courts to override Congress's express exemption and extend the statute's disclosure obligations to Minnesota—despite Congress's clear intent not to regulate states with longstanding polling-place Election Day registration procedures.

PILF's theory lacks any basis in law. As explained below, PILF lacks standing because it has not identified any concrete injury resulting from the Secretary's refusal to disclose voter data. Its claims are independently barred by the Eleventh Amendment, which prohibits federal suits against state officials where, as here, Congress has not abrogated sovereign immunity and the state has not waived it. And in any event, PILF's constitutional arguments are meritless: Congress had ample authority to exempt certain states from the NVRA's requirements, and doing so did not violate any principle of equal sovereignty, congruence, or proportionality. For all these reasons, the district court's decision should be affirmed.

## ARGUMENT

## I.  PILF LACKS STANDING BECAUSE IT HAS NOT SUFFERED A CONCRETE HARM.

Under Article III, a plaintiff may not sue in federal court without first establishing an injury in fact. While PILF claims it was denied access to certain voter registration information, that denial alone is not enough. A bare denial of information, without any resulting real-world harm, does not satisfy the constitutional requirement of a concrete injury. Here, PILF has not identified any concrete consequence flowing from its alleged informational injury. It has not explained how the absence of Minnesota election data has impaired its operations, hindered its ability to carry out its mission, or affected it in any tangible way. Because PILF has alleged no such real-world harm, it lacks standing to bring this suit.

Standing is a constitutional prerequisite to federal jurisdiction, and a plaintiff bears the burden to establish it. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). It can be raised at any time during litigation. *F.B. v. Our Lady of Lourdes Par. & Sch.*, 125 F.4th 898, 902 (8th Cir. 2025). Here, the district court concluded that PILF had standing to bring its claims. (App. 66, R. Doc. 43 at 8, Add. 8.) This Court reviews such determinations de novo. *Huizenga v. Indep. Sch. Dist. No. 11*, 44 F.4th 806, 809 (8th Cir. 2022). While the district court dismissed PILF's lawsuit on the merits rather than for lack of standing, this Court may affirm a district court decision

on any grounds that are supported by the record. *Bluehaven Funding, LLC v. First Am. Title Ins.*, 594 F.3d 1055, 1058 (8th Cir. 2010).

To establish standing, a plaintiff must demonstrate an injury that is concrete, particularized, and actual or imminent—not conjectural or hypothetical. *Lujan*, 504 U.S. at 560. A claimed injury must also be fairly traceable to the challenged conduct and likely to be redressed by a favorable decision. *Spokeo v. Robins*, 578 U.S. 330, 338 (2016). These requirements ensure that a plaintiff has a personal stake in the dispute and that the case presents the kind of concrete controversy that Article III empowers federal courts to resolve.

PILF claims an informational injury. (App. 34, R. Doc. 1 at 28, ¶¶ 133-34.) An "informational injury" can qualify as an injury in fact for purposes of Article III standing—but only under certain factual circumstances. Informational standing exists when a plaintiff is denied access to information that a statute entitles it to receive and the denial causes a concrete harm. *See Fed. Election Comm'n v. Akins*, 524 U.S. 11, 20-21 (1998); *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 449 (1989). In both *Akins* and *Public Citizen*, the plaintiffs sought information that Congress specifically directed the government to make public, and the Court held that denial of access to that information was sufficient for standing because of the concrete harms that the denial threatened them with. *See Akins*, 524 U.S. at 24–25 (finding standing where "the informational injury at issue … directly related to [the

plaintiffs'] voting, the most basic of political rights"); *Pub. Citizen*, 491 U.S. at 449, 451 (finding standing where plaintiffs "might gain significant relief if they" were given access to information and documents at issue, which allow them to "participate more effectively in the judicial selection process").

But even in the context of an alleged informational injury, a plaintiff must allege a harm that is both concrete and particularized. *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021). "[A]n injury in law is not an injury in fact"; plaintiffs must show more than the bare violation of a data-access statute does not establish standing. *Id.* at 423. This concrete harm requirement applies even when Congress has created a statutory right to receive information. *See id.* at 442 ("An asserted informational injury that causes no adverse effects cannot satisfy Article III."). As the Court put it: "No concrete harm, no standing." *Id.* at 429.

*Akins* and *Public Citizen* show why standing does not exist here. In those cases, the denial of information created a concrete harm that directly impaired the plaintiffs' ability to engage in protected political activity: voting in *Akins* and participation in the judicial nomination process in *Public Citizen*. But when a plaintiff alleges only that it was denied access to information, without identifying how that denial tangibly impaired its interests or activities, the injury is not concrete. As the Supreme Court made clear in *TransUnion*, Congress cannot confer standing simply by authorizing a right to information; a plaintiff must also show that the

denial of that information caused a real-world injury. A plaintiff's desire to inspect public records, without more, does not satisfy Article III.

The district court concluded that PILF had adequately pleaded a concrete injury because it alleged that the Secretary's denial of data impeded its ability to carry out its organizational functions—specifically, public education and advocacy regarding voter registration practices. (App. 63, R. Doc. 43 at 5, Add. 5.) But this reasoning stretches the informational injury doctrine beyond its limits. While the plaintiffs in *Public Citizen* and *Akins* had standing when the denial of information impaired core political rights protected by statute, those cases do not stand for the broader proposition that any setback to an organization's preferred mode of operations is sufficient to show a concrete injury. To the contrary, Article III requires plaintiffs to demonstrate a real-world, non-abstract harm resulting from the deprivation of information. PILF's claimed injury does not meet that standard.

The district court overlooked that the plaintiffs in *Public Citizen* and *Akins* were asserting interference with core political rights that lay at the heart of the statutory schemes at issue. In *Akins*, the Court emphasized that the withheld information "directly related to voting, the most basic of political rights," 524 U.S. at 24–25, and in *Public Citizen*, the Court stressed that access to the information would allow the plaintiffs to "participate more effectively in the judicial selection process," 491 U.S. at 449. In both cases, the deprivation of information threatened

to impair the plaintiffs' direct engagement with democratic institutions in ways the statutes were designed to protect.

Here, by contrast, PILF's alleged injury consists primarily of frustration in carrying out its self-appointed watchdog role. That is not a concrete injury under Article III.

None of the injuries PILF alleges in its complaint—whether styled as impediments to research, public education, or institutional knowledge—constitute the kind of concrete harm required for standing. (App. 34-35, R. Doc. 1 at 28-29, ¶¶ 134–46.) An organization cannot manufacture standing "simply by expending money to gather information and advocate against [a government defendant's] action." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024). PILF nonetheless contends that the Secretary's refusal to provide it with voter registration data injures the organization by forcing it to expend money to "counteract" the Secretary's actions. (App. 36, R. Doc. 1 at 30, ¶ 149.) But if that were sufficient to establish a concrete injury, any plaintiff in an informational injury case could render the rule of *TransUnion* meaningless merely by spending money to access information that the government declines to provide. *See All. for Hippocratic Med.*, 602 U.S. at 395 (rejecting plaintiffs' expansive standing theory because it "would mean that all the organizations in America would have standing to challenge

almost every federal policy that they dislike, provided they spend a single dollar opposing those policies").

Indeed, in a nearly identical lawsuit that PILF filed in Pennsylvania, the Third Circuit held that the organization lacked standing. *Pub. Int. Legal Found. v. Sec'y Commonwealth of Penn.*, 136 F.4th 456, 469–70 (3rd Cir. 2025). There, as here, PILF sought voter registration data from a state that denied its request. *Id.* at 459. And as here, PILF claimed that the denial impaired its ability to conduct research, engage in public education, and prioritize institutional resources. *Id.* at 467. The court rejected each of those alleged harms as insufficient to establish a concrete injury under *TransUnion*, *Akins*, *Public Citizen*, and *Alliance for Hippocratic Medicine*. *Id.* at 461–69. The court also emphasized that the purpose of the NVRA is to increase citizen participation in federal elections and that PILF's claimed injuries bear no connection to that purpose:

> In short, as an out-of-state "public interest organization" that has adduced insufficient evidence of a nexus among any adverse effect or downstream consequence and a harm it has suffered because of the Secretary's refusal to provide access to the requested records under *TransUnion* and its progeny, PILF has no standing to sue. PILF does not represent any Pennsylvania citizens who have been affected by the Secretary's purported violation of the NVRA. It has no direct ties to Pennsylvania voters and has not alleged how access to the records it seeks would directly lead to action or that its direct participation in the electoral process has been hindered. It has not suffered any concrete harm.

*Id.* at 467, 469 (internal quotation marks and brackets omitted). The same result should follow here.

Because PILF has not suffered a concrete and particularized injury, it lacks Article III standing to pursue its claims in federal court. Its allegations of harm amount to a mere policy disagreement with the Secretary's interpretation of the NVRA and a corresponding frustration of its organizational preferences. That is not enough to satisfy the requirements of *TransUnion* or any of the precedents it reaffirmed. The district court's contrary conclusion should be reversed.

## II. THE ELEVENTH AMENDMENT BARS PILF'S CLAIMS.

Even if PILF had standing to sue, its claims are independently barred by the Eleventh Amendment. That provision prohibits federal suits against nonconsenting states unless Congress has unequivocally abrogated their sovereign immunity. Here, however, Congress did the opposite: it expressly chose *not* to subject Minnesota to the NVRA's mandates. By exempting states with polling-place Election Day registration from the statute's requirements, Congress deliberately withheld any regulatory burden from Minnesota—and, necessarily, any intent to authorize suit against it. Overriding that legislative judgment and imposing liability on a state that Congress explicitly chose to leave alone would not merely distort the NVRA beyond recognition; it would usurp the very power the Constitution entrusts solely to Congress: the power to decide whether, when, and how to abrogate state sovereign

immunity. PILF's claim thus fails not only for lack of standing, but as a frontal assault on foundational principles of federalism and separation of powers.

Although the Secretary raised Minnesota's Eleventh Amendment immunity in support of his motion to dismiss, the district court did not reach the issue. Regardless, Eleventh Amendment immunity limits the jurisdiction of lower federal courts and may be raised at any stage of litigation. *Rose v. Nebraska*, 748 F.2d 1258, 1262 (8th Cir. 1984).

Under the Eleventh Amendment, each state is a sovereign entity generally immune from suit by private parties without its consent. *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996). Congress may abrogate that immunity, but it can only do so by "unequivocally express[ing] its intent to abrogate the immunity" pursuant to a valid exercise of constitutional authority. *Green v. Mansour*, 474 U.S. 64, 68 (1985). Moreover, a lawsuit brought against a state official in his official capacity is "no different from a suit against the State itself." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). Accordingly, under the Eleventh Amendment, PILF cannot maintain federal claims against the Secretary under the NVRA unless either Congress has abrogated Minnesota's sovereign immunity or the State has waived it.

Minnesota has not waived its Eleventh Amendment immunity from suit in federal court. *See DeGidio v. Perpich*, 612 F. Supp. 1383, 1388–89 (D. Minn. 1985)

(recognizing Minnesota's limited waiver of sovereign immunity from tort actions in state court is not waiver of sovereign immunity in federal court). PILF has never suggested otherwise, and no basis for such a claim exists.

Meanwhile, there is no plausible argument that Congress abrogated Minnesota's sovereign immunity in the NVRA. To the contrary, Congress explicitly exempted Minnesota (and other states that offered polling-place Election Day registration as of August 1, 1994) from the statute's substantive mandates. *See* 52 U.S.C. § 20503(b)(2). A statute that expressly declines to regulate a state cannot possibly be read to abrogate its immunity from suits brought under that very statute. Indeed, any such reading would invert Congress's plainly stated intent—not only by applying substantive provisions to an exempted state, but also by exposing that state to litigation Congress took deliberate steps to avoid. When Congress chooses not to regulate a state, it necessarily chooses not to authorize suits against it.

For the same reasons, PILF cannot invoke the judicially created *Ex parte Young* doctrine to bypass the Eleventh Amendment's bar here. *Ex parte Young* permits a private party to sue a state official in his official capacity for prospective injunctive relief to halt an ongoing violation of federal law. *See 281 Care Comm. v. Arneson*, 638 F.3d 621, 632 (8th Cir. 2011). But because the NVRA exempts Minnesota from its requirements, there is no plausible theory under which the Secretary's refusal to produce records constitutes a violation of federal law.

Moreover, *Ex parte Young* is unavailable when Congress has supplied "a detailed remedial scheme for the enforcement against a State of a statutorily created right." *Seminole Tribe*, 517 U.S. at 74; *Ass'n for Gov't Accountability v. Simon*, 128 F.4th 976, 978–79 (8th Cir. 2025) ("*AGA*"). The NVRA establishes just such a scheme, expressly authorizing enforcement through criminal or civil actions brought by the Attorney General and civil actions by private parties aggrieved by a violation. *See* 52 U.S.C. §§ 20510–11. As this Court recently held in *AGA*, a similarly comprehensive enforcement scheme in a federal law foreclosed the use of *Ex parte Young* to pursue injunctive relief against a state official. 128 F.4th at 979.

Like the requirement that any abrogation of sovereign immunity be unequivocally expressed by Congress, this limit on *Ex parte Young* is founded in the separation of powers. It is for Congress, not the courts, to determine whether, when, and how states may be held liable for violations of federal statutes. *Seminole Tribe*, 517 U.S. at 75–76 (rejecting *Ex parte Young* claim because "the fact that Congress chose to impose upon the State a liability that is significantly more limited than would be the liability imposed upon the state officer under *Ex parte Young* strongly indicates that Congress had no wish to create the latter").[3]

---

[3] This inference from *Seminole Tribe* is even stronger here, where Congress crafted a remedial scheme that expressly imposes no liability whatsoever on Minnesota or other states with polling-place Election Day registration.

For all of these reasons, allowing PILF's suit against the Secretary to proceed would badly undermine the separation of powers. The Supreme Court has long recognized that the decision to abrogate sovereign immunity is entrusted to Congress, not the judiciary. *E.g.*, *Green*, 474 U.S. at 68; *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99 (1984). If a court could declare a statutory exemption invalid and then retroactively impose liability on a state Congress chose not to regulate, it would arrogate to itself the core legislative power to determine the scope of federal intrusion on state sovereignty. That is not how the Eleventh Amendment works, and not how the constitutional structure functions. When Congress elects to impose burdens on the states, it does so clearly and with respect for their sovereign status. And when Congress declines to abrogate state immunity, courts must honor that decision. *See, e.g.*, *Quern v. Jordan*, 440 U.S. 332, 343 (1979) (finding no abrogation in light of Congressional "silence on the matter[, which] is itself a significant indication of the legislative intent").

## III.  CONGRESS CONSTITUTIONALLY EXEMPTED MINNESOTA FROM THE NVRA.

Even if PILF had standing and its claims were not barred by the Eleventh Amendment, its arguments still fail on the merits because Section 4(b)(2) of the NVRA lawfully exempts Minnesota from the Act's disclosure requirements.

All parties agree that the NVRA excludes from its scope any state, including Minnesota, that has allowed election-day registration at polling places since at least

August 1, 1994.  52 U.S.C.  § 20503(b)(2).[4]  PILF nevertheless contends that this Court should override Congress's express decision to exempt Minnesota by invoking constitutional principles drawn from *Shelby County v. Holder*, 570 U.S. 529 (2013), and *City of Boerne v. Flores*, 521 U.S. 507 (1997). According to PILF, the equal sovereignty doctrine and the "congruence and proportionality" test require the Court to rewrite the NVRA to extend its reach to Minnesota despite the statute's plain language to the contrary.

This is an extraordinary request for judicial legislation, asking the Court to create and impose a statutory scheme that Congress deliberately chose not to adopt. The argument fails for several reasons. First, PILF lacks third-party standing to assert claims on behalf of the sovereign interests of states that are subject to the NVRA. Second, those constitutional doctrines do not apply because Congress enacted the NVRA under the Elections Clause. Third, even if the doctrines applied, the NVRA satisfies them. The district court was therefore correct to dismiss PILF's claims on the merits.

The constitutionality of a federal statute is a question of law that this Court reviews de novo. *United States v. Ellingburg*, 113 F.4th 839, 841 (8th Cir. 2024).

---

[4] PILF repeatedly refers to this section as the NVRA's "Transparency Exemption," falsely implying that it applies only to the Act's disclosure obligations. (Appellant's Br. i, 7, 10, 12, 15, 18-19, 39, 41, 43, 51, 57, 58, 61, 64, 67, 68.) It does not. It exempts qualifying states from *all* NVRA requirements.

## A. PILF Lacks Standing to Assert Equal Sovereignty or Congruence-and-Proportionality Claims on Behalf of the States.

PILF cannot ask this Court to invalidate a federal statute on the ground that it treats some states differently from others. That claim, if it belongs to anyone, belongs to the states. Yet PILF is not a state. It is not even a Minnesota resident. It cannot demonstrate the direct, personal injury required to raise a constitutional challenge under *Shelby County* or *City of Boerne*.

The Secretary raised PILF's lack of third-party standing below. Noting that "PILF's claim fails on the merits anyway," the district court declined to reach the issue. (App. 65-66, R. Doc. 43 at 7-8, Add. 7-8.)

To assert the rights of a third party, a plaintiff must show both a close relationship with the right-holder and an obstacle that prevents the right-holder from suing on its own behalf. *See Kowalski v. Tesmer*, 543 U.S. 125, 130–31 (2004); *see also Hodak v. City of St. Peters*, 535 F.3d 899, 903–06 (8th Cir. 2008) (describing standard for third-party standing). PILF satisfies neither requirement. It has no relationship, let alone a "close" one, with any state that is covered by the NVRA. And nothing prevents a state from bringing its own challenge if it believes Congress has unconstitutionally subjected it to disparate treatment.[5] But no state has made any

---

[5] Indeed, PILF itself has sued several other states for alleged noncompliance with the NVRA—even though its position here is that the NVRA's regulation of those states violates equal sovereignty and congruence-and-proportionality principles. *See, e.g.*, *Sec'y Commonwealth of Penn.*, 136 F.4th at 459; *Pub. Int. Legal Found. v.* (Footnote Continued on Next Page.)

such claim here. *Cf. Sessions v. Morales-Santana*, 582 U.S. 47, 57 (2017) (holding that "hindrance" requirement is met when third party's failure to assert a claim in its own right "stems from disability, not disinterest") (internal quotation marks omitted).

Before the district court, PILF relied on *Bond v. United States*, 564 U.S. 211 (2011), to argue that it had an individual interest in the equal sovereignty of the states. But that reliance is misplaced. In *Bond*, the Supreme Court held that an individual criminal defendant had standing to raise Tenth Amendment arguments because she was personally subject to a federal statute that allegedly intruded on state authority, thereby depriving her of liberty. *Id.* at 222–24. But PILF does not face any comparable harm. No federal law is being enforced against it. Rather, PILF alleges only that it cannot use NVRA to access information—an asserted injury arising from Congress's deliberate decision *not* to regulate Minnesota, not from any overreach. That is not the kind of direct personal harm that supported standing in *Bond*.

Moreover, the individual interest recognized in *Bond* arose from a federal statute that displaced state law and directly altered the legal regime governing the plaintiff. *Id.* at 222–25. PILF, by contrast, does not claim that any federal law

---

*Dahlstrom*, 673 F. Supp. 3d 1004, 1009 (D. Alaska 2023); *Pub. Int. Legal Found. v. Matthews*, 589 F. Supp. 3d 932, 936 (C.D. Ill. 2022); *Pub. Int. Legal Found. v. Way*, No. CV 22-02865 (FLW), 2022 WL 16834701, at *2 (D.N.J. Nov. 9, 2022).

displaced Minnesota's statutes in a way that harmed PILF or that it has any interest in Minnesota's sovereignty. PILF's asserted injury stems not from federal overreach, but from Congress's refusal to extend federal regulation to Minnesota. That argument places PILF in the odd position of invoking federalism principles not to shield individuals from intrusive national power but to compel Congress to regulate more aggressively. Whatever *Bond* means, it does not authorize a private party to wield the equal sovereignty principle as a weapon against another state.

In short, PILF cannot invoke the equal sovereignty or congruence-and-proportionality doctrines because it lacks standing to assert the interests of the states affected by the NVRA. Moreover, it has no personal interest that would support such a claim under *Bond* or any other precedent.

## B. The NVRA's Exemption for Polling-Place Election Day Registration States Falls Squarely Within Congress's Elections Clause Powers.

PILF's facial challenge to the NVRA hinges on two constitutional doctrines— the "equal sovereignty" principle applied in *Shelby County* and the "congruence and proportionality" standard from *City of Boerne*. As the district court correctly held, neither doctrine has any bearing here: *Shelby County* and *City of Boerne* addressed enforcement legislation under the Reconstruction Amendments, not Congress's distinct and "paramount" authority under the Elections Clause to regulate federal elections. And even if either doctrine somehow extended to this context, PILF's

challenge would still fail. The NVRA's limited exemption for states with polling-place Election Day registration is both substantively reasonable and narrowly drawn, easily satisfying the standards of both decisions even if they did apply.

As an initial matter, Acts of Congress are presumed constitutional, and the party challenging a statute bears the heavy burden of demonstrating that it violates the Constitution. *United States v. Morrison*, 529 U.S. 598, 607 (2000). This Court reviews such constitutional challenges de novo. *United States v. Stephens*, 594 F.3d 1033, 1036 (8th Cir. 2010).

### 1. The equal sovereignty principle from *Shelby County* does not apply to the NVRA.

The district court correctly rejected PILF's invocation of *Shelby County*, holding that the equal sovereignty principle articulated there does not apply to legislation enacted under the Elections Clause. (App. 70, R. Doc. 43 at 12, Add. 12.) *Shelby County* involved the Voting Rights Act's preclearance requirements, which represented an extraordinary federal intrusion into state election administration under the Fifteenth Amendment—a context that is vastly different than Congress's regulation of federal elections under Article I. As the district court explained, the NVRA is grounded in Congress's "paramount" Elections Clause authority, which allows for both uniform and nonuniform regulation of federal elections. *Id.* (quoting *ITCA*, 570 U.S. at 9 (2013)).

Unlike the VRA's preclearance regime, the NVRA does not single out certain states for burdens based on outdated data or historical categories. Rather, its exemption for states with polling-place Election Day registration reflects an affirmative congressional judgment, grounded in current policy considerations, about which states have adopted sufficiently inclusive registration practices to warrant exclusion from further federal mandates. Moreover, courts across the country have rightly concluded that *Shelby County* does not constrain Congress's power under Article I. The principle of equal sovereignty has never been applied to invalidate Elections Clause legislation, and nothing in this case provides a basis to become the first.

As the district court recognized, *Shelby County*'s equal sovereignty principle arose in a uniquely sensitive constitutional setting. The case involved an extensive preclearance regime that forced certain states to obtain federal permission before making any change to their voting laws—an "extraordinary" intrusion on state sovereignty grounded in the Fifteenth Amendment's enforcement powers. 570 U.S. at 534–35, 545. That context is critical: the Court held that "[t]hese departures from the basic features of our system of government" were sufficiently serious that they required special justification. *Id.* at 545–47. *Shelby County* did not address, and certainly did not limit, Congress's power under the Elections Clause to regulate the manner of federal elections.

That distinction matters because Congress's Elections Clause authority is fundamentally different from its enforcement powers under the Fourteenth and Fifteenth Amendments. Article I, Section 4 grants Congress "paramount" power to regulate federal elections and authorizes it to "make or alter" state procedures as it deems necessary. *ITCA*, 570 U.S. at 9; *see also Foster v. Love*, 522 U.S. 67, 69 (1997) ("[I]t is well settled that the Elections Clause grants Congress the power to override state regulations by establishing uniform rules for federal elections, binding on the States.") (quotation marks omitted). Unlike the enforcement clauses of the Reconstruction Amendments, the Elections Clause contains no requirement that legislation be appropriate, congruent, or proportional. Instead, it allows Congress to override state election procedures pertaining to federal elections. *See Smiley v. Holm*, 285 U.S. 355, 366–67 (1932).

PILF contends that because Congress chose to exempt polling-place Election Day registration states from the NVRA, this exemption must meet the same demanding scrutiny that *Shelby County* applied to the Voting Rights Act's outdated coverage formula. But that analogy falls apart. Section 4(b)(2) of the NVRA is not a backward-looking penalty imposed based on historical violations; it is a forward-looking policy choice that reflects Congress's judgment that polling-place Election Day registration already accomplishes the Act's objectives. Unlike the preclearance regime in *Shelby County*, which remained fixed for decades without reexamination,

the NVRA's exemption turns on a state's own decision to adopt and maintain polling-place Election Day registration. *See* 52 U.S.C. § 20503(b)(2). It thus allowed states, at passage of the NVRA, to opt out of the federal framework (and, at any future date, to opt into it) through their own democratic processes by enacting (or repealing) polling-place Election Day registration.

Moreover, no court has ever applied *Shelby County*'s equal sovereignty principle to invalidate legislation enacted under the Elections Clause—or under any other Article I power. That includes not only election-related statutes, but also those enacted under the Commerce Clause and Spending Clause. *See, e.g.*, *United States v. Ohio*, 98 F.4th 292, 308–14 (6th Cir. 2024); *Mayhew v. Burwell*, 772 F.3d 80, 93–97 (1st Cir. 2014); *NCAA v. Governor of N.J.*, 730 F.3d 208, 238–39 (3rd Cir. 2013). Courts have consistently recognized that the equal sovereignty doctrine, whatever its precise scope, does not apply to congressional powers derived from Article I.

Finally, as the district court correctly noted, the text of the Elections Clause itself underscores why *Shelby County*'s equal sovereignty principle has no application here. When the Framers intended uniform treatment of the states, they said so—explicitly requiring uniformity in matters like duties, naturalization, and bankruptcy. *See* U.S. Const. art. I, §§ 8–9. The Elections Clause contains no such requirement. Instead, it empowers Congress to "make or alter" state laws governing federal elections as it deems appropriate—including through nonuniform rules. *See*

*id.* § 4; *ITCA*, 570 U.S. at 8; *Smiley*, 285 U.S. at 366–67. That structure confirms what the case law already reflects: the equal sovereignty principle does not limit Congress's power under the Elections Clause.

> **2.** **Even if *Shelby County* applied, the NVRA's exemption for polling-place Election Day registration states satisfies its test.**

Even if *Shelby County*'s equal sovereignty principle applied to legislation enacted under the Elections Clause, the NVRA's exemption for states with polling-place Election Day registration procedures would readily satisfy it. The NVRA does not single out states for punitive treatment; it offers all states a benefit conditioned on adopting a policy that advances the statute's goal of broad voter participation. That condition bears a logical relationship to the purpose of the Act, and it is grounded in current realities, not outdated data or historical judgments. This is the kind of neutral, forward-looking, and rationally designed federal policy that even the most demanding equal sovereignty standard would permit.

First, the *Shelby County* Court struck down the Voting Rights Act's preclearance formula in part because it "target[ed] only some parts of the country." *Shelby Cnty.*, 570 U.S. at 537. The NVRA's exemption for polling-place Election Day registration states, by contrast, treats all states evenhandedly. Congress provided every state the opportunity to qualify for the exemption by adopting Election Day registration in polling places before the statute's effective date in August 1994. *See* 52 U.S.C. § 20503(b)(2). Congress did not single out any states

for special burdens based on past conduct, demographic characteristics, or historical fault. Rather, it offered a prospective incentive tied to a present-tense policy choice—one available to all states on equal terms. That is a neutral and uniform approach, not a discriminatory or punitive one.

Second, the NVRA's exemption meets *Shelby County*'s requirement that any "disparate geographic coverage [be] sufficiently related to the problem that it targets." *Shelby Cnty.*, 570 U.S. at 542. Congress enacted the NVRA to promote voter registration and participation in federal elections, particularly through standardized procedures and safeguards. 52 U.S.C. §§ 20501(b)(1)–(2) (stating Congress's intent to "increase the number of eligible citizens who register to vote in elections for Federal office" and to "enhance the participation of eligible citizens as voters in elections for Federal office"), 20501(a) (finding that "discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation"), 20503(a) (establishing minimum procedures to register for federal elections). States that had adopted Election Day registration in polling places before the NVRA's effective date had already taken significant steps to reduce registration barriers and enhance access. The exemption thus targets the same problem—low registration and participation rates—by recognizing that certain states had addressed the underlying concern. That connection easily meets the

rational-fit standard endorsed by *Shelby County* and its predecessors. *See id.* at 544;

*South Carolina v. Katzenbach*, 383 U.S. 301, 330 (1966).

PILF repeatedly attempts to reframe the NVRA as a transparency statute, emphasizing the Act's disclosure provision while sidelining its broader regulatory context. But the NVRA's text refutes that narrative: its findings and purposes say nothing about transparency. *See* 52 U.S.C. § 20501. The only mention of public access appears in section 20507(i), buried deep within a lengthy provision governing voter roll maintenance. Courts have rightly concluded that transparency is not a freestanding aim of the NVRA and thus permitted states to redact sensitive information even from documents covered by § 20507(i). *E.g.*, *Pub. Int. Legal Found. v. Bellows*, 92 F.4th 36, 54–56 (1st Cir. 2024); *Pub. Int. Legal Found. v. Matthews*, 589 F. Supp. 3d 932, 942 (C.D. Ill. 2022); *Project Vote v. Kemp*, 208 F. Supp. 3d 1320, 1344 (N.D. Ga. 2016).

Finally, the NVRA's exemption satisfies *Shelby County*'s requirement that "current burdens" be "justified by current needs." *Shelby Cnty.*, 570 U.S. at 550. As an initial matter, states that maintain polling-place Election Day registration continue to provide eligible voters with expanded registration access, directly serving the NVRA's primary purpose of increasing participation in federal elections. *See* 52 U.S.C. § 20501(b)(1)-(2).

More broadly, Congress's decision to limit the exemption to states that enacted Election Day registration in polling places before August 1994 bears a "logical relation" to its policy aims. *Shelby Cnty.*, 570 U.S. at 554, 56 (invalidating preclearance formula as "irrational"). The statutory deadline serves the dual purposes of (1) preventing any perception of ongoing federal pressure to adopt a particular state-level election policy as a means of regulatory avoidance and (2) ensuring that states that have implemented the NVRA cannot later exempt themselves from it by belatedly adopting Election Day registration and dismantling the federal registration architecture already in place.

The exemption is also not frozen in time, because Section 4(b) exempts only states that either do not register voters or have maintained Polling Place EDR "*continuously* on and after August 1, 1994." 52 U.S.C. § 20503(b)(2) (emphasis added). Any state that ceases these practices becomes subject to the NVRA. That dynamic feature distinguishes this provision from the rigid, outdated formula invalidated in *Shelby County*.

For these reasons, even if *Shelby County*'s equal sovereignty principle applied to Elections Clause legislation, the NVRA's exemption for states with longstanding polling-place Election Day registration would readily withstand constitutional scrutiny.

### 3. *City of Boerne* does not apply to Elections Clause legislation.

PILF's reliance on *City of Boerne* is similarly misplaced. That decision addressed Congress's enforcement powers under Section 5 of the Fourteenth Amendment and is irrelevant to its powers under Article I. *See City of Boerne*, 521 U.S. at 532–36. The Supreme Court has never applied the *Boerne* standard to legislation enacted under the Elections Clause, and the Supreme Court has expressly upheld statutes under one enumerated power even when they could not be sustained under another. *See, e.g.*, *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 561 (2012) (upholding Affordable Care Act under taxing power but not Commerce Clause). Because the NVRA was enacted under the Elections Clause, *Boerne* has no application here.

### 4. The challenged exemption satisfies the *City of Boerne* standard, even if it applied.

Even if *City of Boerne* governed congressional power under the Elections Clause, Section 4(b)(2) of the NVRA would satisfy that framework. *City of Boerne* requires a "congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end," *id.* at 520—and if the NVRA's full regulatory regime satisfies that standard (as PILF appears to concede), it is hard to see how an exemption could fail to do so. Section 4(b)(2) increases the statute's fit to its purpose by declining to regulate states that had already adopted an alternative way to expand registration and participation before the NVRA took effect.

The *City of Boerne* test evaluates whether federal legislation enforcing the Reconstruction Amendments is properly tailored to remedy or prevent constitutional violations. 521 U.S. at 519–20. That inquiry is concerned with the relationship between a statute's burdens and the constitutional injuries that prompted Congress to act, not with whether a statute imposes those burdens equally on all regulated entities. *See id.* at 530–32. PILF's suggestion that an exemption from regulation could somehow upset that balance reverses the analysis: exempting certain states from NVRA mandates reduces the federal burden, and in doing so makes the statute more—not less—congruent and proportional to the harm that Congress identified.

Congress also had ample basis for concluding that the NVRA was needed to address "discriminatory and unfair registration laws and procedures" that historically suppressed voter participation. 52 U.S.C. § 20501(a)(3); *see also Allen v. Milligan*, 599 U.S. 1, 41 (2023) (recognizing congressional power to "outlaw voting practices that are discriminatory in effect"). That concern underlies both the NVRA's substantive requirements and the exemption in Section 4(b)(2). Congress rationally excluded states that had already adopted polling-place Election Day registration by the NVRA's effective date, because those states had addressed the statute's core problem through other means. Far from undermining the statute's congruence and proportionality, Section 4(b)(2) enhances it.

Congress has "wide latitude" when legislating under the Fourteenth and Fifteenth Amendments to determine how best to address constitutional harms. *City of Boerne*, 521 U.S. at 520. Section 4(b)(2) reflects that discretion: it exempts states that had already met the NVRA's goals through polling-place Election Day registration, thereby reducing federal intrusion where unnecessary and reinforcing the statute's proportionality to the problem it was enacted to solve.

In sum, Section 4(b)(2) of the NVRA neither violates principles of equal sovereignty nor exceeds the limits of Congress's power under the Elections Clause—or, for that matter, under the Reconstruction Amendments. The exemption serves the NVRA's aims, reflects current conditions, and draws rational distinctions—all within the bounds of constitutional authority.

For all of these reasons, the district court correctly rejected the constitutional theory on which PILF's claims are founded and granted the Secretary's motion to dismiss below. That decision should be affirmed.

## CONCLUSION

For all the reasons set forth above, the Secretary respectfully requests that the Court affirm the district court's dismissal of all claims in PILF's complaint.

Dated: July 2, 2025

Respectfully submitted,

KEITH ELLISON
State of Minnesota
Attorney General

/s/**Nathan J. Hartshorn**
NATHAN J. HARTSHORN
Assistant Attorney General
Atty. Reg. No. 0320602

ERIN FARMER
Assistant Attorney General
Atty. Reg. No. 0402662

LINNEA VANPILSUM-BLOOM
Assistant Attorney General
Atty. Reg. No. 0403783

445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101-2131
(651) 757-1252 (Voice)
(651) 297-1235 (Fax)
Nathan.Hartshorn@ag.state.mn.us

ATTORNEYS FOR APPELLEE

|#6099050

## CERTIFICATE OF COMPLIANCE
## WITH FRAP 32

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 7,439 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14 pt Times New Roman font.

/s/**Nathan J. Hartshorn**
NATHAN J. HARTSHORN
Assistant Attorney General

## CERTIFICATE OF COMPLIANCE
## WITH 8th Cir. R. 28A(h)(2)

The undersigned, on behalf of the party filing and serving this brief, certifies that the brief has been scanned for viruses and that the brief is virus-free.

/s/**Brenda Hanson**
BRENDA HANSON

## CERTIFICATE OF SERVICE

I hereby certify that on July 2, 2025, I caused the foregoing brief to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

/s/**Nathan J. Hartshorn**
NATHAN J. HARTSHORN
Assistant Attorney General